UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Regents of the University of Minnesota,

Civil File No. *06-5084 PQS/RLE*

Plaintiff,

vs.

United States of America,

Defendant.

COMPLAINT

Plaintiff, Regents of the University of Minnesota, brings this action and alleges:

PARTIES, JURISDICTION AND VENUE

1.   This is an action arising under the internal revenue laws of the United States for the recovery of FICA taxes for medical residents erroneously or illegally assessed and collected for the second quarter of 2005 under the Federal Insurance Contributions Act ("FICA") (26 U.S.C. §§ 3101 et seq.), and interest thereon.

2.   Plaintiff is a body corporate established by the laws of the Territory of Minnesota, and its status as such is perpetuated by the Constitution of the State of Minnesota. For federal tax purposes, Plaintiff is an integral part of the State of Minnesota. Plaintiff's principal office is located in Minneapolis, Minnesota.

3.   Defendant is the United States of America.

4.   Jurisdiction is conferred on this Court by 28 U.S.C. § 1346(a)(1), and venue in this Court is proper under 28 U.S.C. § 1402(a)(2).

SCANNED

DEC 2 6 2006

U.S. DISTRICT COURT

BACKGROUND

    5.    Plaintiff operates graduate medical education programs for medical residents and fellows ("Residents"). Most of the programs are formally reviewed and approved by national accreditation bodies, and all of them provide a formal and structured educational program. Residents are enrolled in the programs, register and receive credits for courses, attend lectures, undertake and report on research, and participate in "teaching rounds" and patient care. The Residents receive grades or other written evaluations of their performance in each course and may be terminated from the programs for failure to satisfy academic standards. Upon completion of the programs, Residents receive formal certification. Stipends are paid to the Residents to provide a minimum level of financial support during their enrollment. This support is far below the level of the salaries and benefits that physicians at comparable levels of training would command in the marketplace. The primary purpose of the programs is educational.

    6.    In 1998, the United States Court of Appeals for the Eighth Circuit held that the stipends paid to the Residents in 1985-1986 were not subject to social security contributions (taxes). One of the grounds for this decision is that the Residents were excluded from social security coverage because they are "students" within the meaning of an exclusion authorized by Section 210(a)(5) and (10) of the Social Security Act ("Act") (42 U.S.C. § 410(a(5) & (10)) and elected by the State of Minnesota ("State") in an agreement between the State and the Federal Government under Section 218 of the Act (42 U.S.C. § 418) ("Section 218 Agreement") that governed the application of the social security system to employees of the State and its political subdivisions in 1985-1986. See State of Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998), acq. SSA Acquiescence Ruling 98-5(8), 63 F.R. 58444 (Oct. 30, 1998) (applicable to 8th Circuit) ("Court of Appeals Decision"). A copy of the Court of Appeals Decision is attached as Exhibit A.

7.     Effective on January 1, 1987, the social security taxation of state and local governmental employees covered by Section 218 agreements became subject to FICA through an amendment of Section 3121(b)(7) of the Internal Revenue Code ("Code") (26 U.S.C. § 3121(b)(7)). See P.L. 99-509, § 9002(b)(1)(A) (1986). FICA contains a "student" exclusion in Section 3121(b)(10) of the Code (26 U.S.C. § 3121(b)(10)) that is substantially identical to the "student" exclusion contained in Section 210(a)(10) of the Act (42 U.S.C. § 410(a)(10)).

8.     Following the Court of Appeals Decision, the Internal Revenue Service ("IRS") allowed refund claims filed by Plaintiff with respect to FICA taxes collected and paid on the Residents' stipends from October 1, 1990 through June 30, 1998, and Plaintiff discontinued withholding and payment of FICA taxes with respect to such stipends as of July 1, 1998.

9.     Prior to April 1, 2005, the Treasury Regulations adopted under the FICA "student" exclusion provided that "student" status is to be determined on the basis of "the relationship of . . . [the] employee with the organization for which the services are performed" and that an employee is a "student" if the services are performed "as an incident to and for the purpose of pursuing a course of study" at the employer organization.   26 C.F.R. § 31.3121(b)(10)-2(c) (26 C.F.R. § 31.3121(b)(10)-2(c)) (as in effect before 4/1/05).

10.    On December 21, 2004 the Secretary of the Treasury ("Secretary") adopted amendments of Treas. Reg. § 31.3121(b)(10)-2 (26 C.F.R. § 31.3121(b)(10)-2), governing the "student" exclusion from FICA under Section 3121(b)(10) of the Code. See T.D. 9167, 69 F.R. 76404 (Dec. 21, 2004) ("Amended Regulations"). The Amended Regulations are effective for services performed on or after April 1, 2005.

11.    The "general rule" prescribed by the Amended Regulations with respect to "student" status ("General Rule") provides in substance that (a) "student" status shall be

3

determined on the basis of "the relationship of the employee with the organization for which the services are performed," (b) an employee is a "student" if the services are "incident to and for the purpose of pursuing a course of study" at the employer organization, (c) the "educational aspect" of the relationship between employer and employee, as compared to the "service aspect," must be "predominant" for the employee's services to be "incident to and for the purpose of pursuing a course of study," (d) the "educational" and "service" aspects of the relationship are evaluated based on all the "relevant facts and circumstances" related thereto, and (e) "the evaluation of the service aspect of the relationship is not affected by the fact that the services . . . may have an educational, instructional, or training aspect." See 26 C.F.R. § 31.3121(b)(10)-2(d)(3)(i).

12.     The General Rule implicitly considers "services" having an "educational, instructional, or training aspect" in evaluating the "educational aspect" of the employer/employee relationship by providing that the "educational aspect" is evaluated "based on all the relevant facts and circumstances." See 26 C.F.R. § 31.3121(b)(10)-2(d)(3)(i), (iv).

13.     As an exception to the General Rule ("Exception"), the Amended Regulations provide in substance that (a) a "full-time employee" does not qualify as a "student," (b) a "full-time employee" is defined as an employee whose "normal work schedule" is 40 hours or more per week, (c) the determination of an employee's normal work schedule "is not affected by the fact that the services performed by the employee may have an educational, instructional, or training aspect," and (d) consequently, and without regard to "other relevant factors," a medical resident whose normal work schedule is 40 hours or more per week does not qualify for the "student" exclusion. See 26 C.F.R. §§ 31.3121(b)(10)-2(d)(3)(iii), 3121(b)(10)-2(e), Ex. 4.

14.     Plaintiff has withheld and paid FICA taxes with respect to stipends paid to the Residents for services performed on or after April 1, 2005. An employment tax return

4

(Form 941) for the second quarter of 2005 reflecting those taxes was timely filed with the Internal Revenue Service Center in Ogden, Utah, and the taxes shown thereon to be due were timely paid.

15.     A claim for refund (Form 843) of the FICA taxes withheld and paid on stipends paid to Residents in the second quarter of 2005 was timely filed by certified mail, addressed to the Internal Revenue Service Center in Ogden, Utah and mailed on March 9, 2006. The claim was received by the Center on March 16, 2006.

16.     The amount of the claim is $1,094,803.92.

17.     Copies of the claim (without attachments) and of the certified mail receipts evidencing its mailing and receipt are attached as Exhibit B.  The requirements of 26 U.S.C. § 7422(a) are satisfied.

18.     More than six months have elapsed since the claim was filed and no action has been taken thereon.  The requirements of 26 U.S.C. § 6532(a)(1) are satisfied.

COUNT I

Partial Invalidity of Amended Regulations

19.     Plaintiff incorporates by reference all preceding allegations of this Complaint.

20.     The Exception described in Paragraph 13 is inconsistent with the plain meaning of 26 U.S.C. § 3121(b)(10), which provides an exclusion for "students," because it categorically denies "student" status to persons whose "normal work schedule" is 40 hours or more per week, without regard to other facts and circumstances (including the educational, instructional or training aspects of the services) that may be relevant to their status as "students." In addition, by denying "student" status to this limited category of persons, without regard to other relevant facts and circumstances, the Exception is arbitrary, capricious, internally

5

inconsistent and unreasonable. For these reasons, the Exception exceeds the regulatory authority of the Secretary under 26 U.S.C. § 7805 and is invalid.

21.   Since the Exception is invalid, the General Rule applies to the Residents.

## COUNT II

### Legislative History (Collateral Estoppel and Merits)

22.   Plaintiff incorporates by reference all preceding allegations of this Complaint.

23.   In the Notice of Proposed Rulemaking initiating proceedings that culminated in the adoption of the Amended Regulations, the Internal Revenue Service and Department of the Treasury contend that (a) legislative history establishes that the "student" exclusion was intended to apply to persons earning "modest amount[s]" of compensation and (b) the enactment and repeal of the FICA "intern" exclusion (formerly provided by 26 U.S.C. § 3121(b)(13)), and the related opinion in St. Luke's Hospital Association v. United States, 333 F.2d 157 (6th Cir. 1964), cert. denied, 379 U.S. 963 (1965), establish that the "student" exclusion was not intended to apply to medical residents. See REG-156421-03, 2004-1 C.B. 571, 574, 575-576 (Feb. 24, 2004), 69 F.R. 8604 (Feb. 25, 2004).

24.   In 1996 the State of Minnesota (acting for Plaintiff) commenced an action in the United States District Court for the District of Minnesota, pursuant to former 42 U.S.C. § 418(t), for a redetermination of the correctness of an assessment made by the Commissioner of Social Security ("Commissioner") with respect to social security contributions (taxes) on stipends paid to the Residents in 1985-1986. In holding that the stipends were excluded from social security coverage under the "student" exclusion provided by Section 210(a)(10) of the Social Security Act (42 U.S.C. § 410(a)(10)), substantially identical to the FICA student exclusion provided by Section 3121(b)(10) of the Code, the District Court considered and

6

rejected contentions substantially identical to those described in Paragraph 23. These contentions were not made, and therefore were conceded, in the Commissioner's appeal from the decision of the District Court. See State of Minnesota v. Chater, Civ. No. 4-96-756, 1997 WL 33352908 (D. Minn. May 21, 1997) ("District Court Decision"), aff'd, State of Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998)) (Court of Appeals Decision). A copy of the District Court Decision is attached as Exhibit C.

25.     Each party to this action is in privity with the corresponding party in the action described in Paragraph 24.

26.     In the determination of Count I, the District Court Decision (affirmed by the Court of Appeals Decision) bars Defendant, under the doctrine of collateral estoppel, from re-litigating in this action the contentions described in Paragraph 23. Alternatively, if Defendant is permitted to and does re-litigate those contentions, they are erroneous.

COUNT III

Conflict of Amended Regulations with Social Security Administration Regulation

27.     Plaintiff incorporates by reference Paragraphs 1-19 of this Complaint.

28.     The "student" exclusion contained in Section 210(a)(10) of the Social Security Act ("Act") (42 U.S.C. § 410(a)(10)) applies to the determination of social security benefits under the Act. In addition, it applies (in conjunction with the FICA "student" exclusion provided by 26 U.S.C. § 3121(b)(10)) to the determination of FICA tax liability with respect to a state or local governmental employee covered by a Section 218 agreement in which the State has elected to apply the student exclusion.

29.     The Social Security Administration ("SSA") has adopted a regulation under the Act that interprets the "student" exclusion provided by the Act ("SSA Regulation"). The SSA Regulation provides: "Whether you are student for purposes of this section depends on

7

your relationship with your employer. If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student and your work is not considered employment." 20 C.F.R. § 404.1028(c). The SSA Regulation was amended to its present form in 1980 to make it "clearer and easier for the public to use." 45 F.R. 20074 (1980). Prior to 1980, the SSA Regulation was substantially identical to the regulation in effect under 26 U.S.C. § 3121(b)(10) before the Amended Regulations became effective.

30.     As a result of the adoption of the Amended Regulations under 26 U.S.C. § 3121(b)(10), and the absence of a corresponding amendment of the SSA Regulation, inconsistent regulations have applied since April 1, 2005 to the determination of "student" status for the purposes described in Paragraph 28.

31.     Since the relevant provisions of FICA and the Act are substantially identical they must be read in pari materia, and regulations issued under both statutes must be consistent. In the alternative to Count I, therefore, the Amended Regulations and the SSA Regulation must be reconciled by invalidating the Exception adopted in the Amended Regulations because (a) the Court has the power to sever language from a regulation but not the power to add language to a regulation and (b) the SSA Regulation is entitled to greater deference than the Amended Regulations because the former was adopted (in its original form) contemporaneously with the enactment of the "student" exclusion and has been in effect for a considerably longer period of time.

32.     Because the Exception applied in the Amended Regulations to "full-time employees" is invalid, the General Rule applies to the Residents.

8

## COUNT IV

### Application of General Rule (Collateral Estoppel and Merits)

33.     Plaintiff incorporates by reference Paragraphs 1-19, 21-22 and 36-40 of this Complaint.

34.     For the reasons alleged in Counts I and III, the Exception applied in the Amended Regulations to "full-time employees" is invalid and the General Rule applied in the Amended Regulations to other employees also applies to the Residents.

35.     The application to the Residents of a facts and circumstances test was litigated in the Court of Appeals Decision.  In holding that the stipends paid to the Residents in 1985-1986 were excluded from social security coverage under the "student" exclusion provided by Section 201(a)(10) of the Social Security Act (42 U.S.C. § 410(a)(10)), substantially identical to the FICA student exclusion provided by Section 3121(b)(10) of the Code, the Court of Appeals held that the SSA Regulation (20 C.F.R. § 404.1028(c)) "contemplates a case-by-case examination to determine if an individual's relationship with a school is primarily for educational purposes or primarily to earn a living," 151 F.3d at 748, applied that test to the Residents, and held that the Residents were "students."  The General Rule provided by the Amended Regulations is substantially identical to the "case-by-case examination" contemplated by the SSA regulation as construed and applied to the Residents in the Court of Appeals Decision.

36.     Each party to this action is in privity with the corresponding party in the action described in Paragraph 35.

37.     The Court of Appeals decision bars Defendant, under the doctrine of collateral estoppel, from re-litigating in this action the application of the General Rule to the

Residents.   Alternatively, if Defendant is permitted to and does re-litigate that issue, the

Residents are "students" under the General Rule.

        WHEREFORE, Plaintiff demands judgment against Defendant in the amount of

$1,094,803.92, or in such other amount as may be legally refundable, plus interest, costs and

disbursements as allowed by law, and for such other relief as the Court may deem just and

proper.

        Dated:  December 22, 2006

                DORSEY & WHITNEY LLP

                By:

                  Thomas Tinkham (#110176)
                  John W. Windhorst, Jr. (#117924)
                  50 South Sixth Street, Suite 1500
                  Minneapolis, MN  55402-1498
                  (612) 340-2600

                MARK B. ROTENBERG
                General Counsel
                University of Minnesota

                By:

                  William P. Donohue (#23578)
                  Deputy General Counsel
                  360 McNamara Alumni Center
                  200 Oak Street S.E.
                  Minneapolis, MN 55455-2006
                  (612) 624-4100

                Attorneys for Plaintiff



**DORSEY**

JOHN W. WINDHORST, JR.
(612) 340-2645
FAX (612) 340-8827
windhorst.john@dorsey.com

December 27, 2006

**VIA MESSENGER**

Clerk of Court
United States District Court
202 U.S. Courthouse
300 South 4th Street
Minneapolis, MN 55415

     Re:    Regents of the University of Minnesota v. United States of America

Dear Sir and/or Madam:

     Enclosed for filing are initiating documents in regard to the above referenced matter, as follows:

     1.    Civil Cover Sheet;

     2.    Summons;

     3.    Complaint; and

     4.    Filing fee in the amount of $ 350.00

     Very truly yours,

John W. Windhorst, Jr.

Enclosures
cc:    Tom Tinkham

against vicarious liability. Nor does it raise the bar for the pleadings of a class of civil rights plaintiffs. It is simply the uniform application of a rule of construction: an inference that a warden is directly involved in a prison's daily operations is not reasonable. This case does not present the question whether a suit against a warden for an isolated or local incident would state an Eighth Amendment claim if it explicitly contended that the warden was directly involved in day-to-day management, so our view on that point is not binding. But presumably such a complaint would at least survive a motion to dismiss if it were otherwise sound. (The pleading must also satisfy Rule 11(b), and discovery would not necessarily be the next step, *cf. Crawford–El v. Britton,* —— U.S. ——, ————, 118 S.Ct. 1584, 1596–98, 140 L.Ed.2d 759 (1998), but those are separate issues.) The prison might be very small, the title "warden" might be used in an unusual way, or a warden might have temporarily taken on direct management of some aspects of the prison due to special circumstances. Nothing of that sort is alleged here. The complaint was drafted with the assistance of counsel, and the plaintiff had an opportunity to "amend[ ] the complaint to name any correctional officials directly responsible for the mishap." Rule to Show Cause, R. 19, at 1; *see Billman v. Indiana Dep't of Corrections,* 56 F.3d 785, 789–90 (7th Cir.1995). The plaintiff has not drawn into question any of our precedents. Taking an independent look at the matter, we conclude that the complaint was properly dismissed.

Although the district court described the dismissal as "without prejudice," we are satisfied that this was the court's final decision, particularly in light of the court's next sentence: "The case is terminated." *See Le-Blang Motors,* 148 F.3d at 687. We are also satisfied that there was a timely notice of appeal in this case under Rule 4(c) of the rules of appellate procedure. *Cf. United States v. Kimberlin,* 898 F.2d 1262, 1265 (7th Cir.1990). The plaintiff changed lawyers between the district court and this court, and there was some question whether the plaintiff was represented by counsel at the time he filed his notice of appeal. The plaintiff's

trial counsel ultimately submitted an affidavit indicating that he was no longer representing the plaintiff at the relevant time, and the defendant does not dispute the accuracy of the affidavit.

AFFIRMED.



STATE OF MINNESOTA, Appellee,

v.

Kenneth S. APFEL, Commissioner of Social Security; Social Security Administration, Appellants.

No. 97–3141.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1998.

Decided July 6, 1998.

State brought action against social security commissioner seeking redetermination of state's liability for unpaid social security contributions attributable to stipends paid to medical residents enrolled in state university's graduate medical education program. The United States District Court for the District of Minnesota, Ann D. Montgomery, J., granted summary judgment for state, and commissioner appealed. The Court of Appeals, Wollman, Circuit Judge, held that: (1) residents were not "employees" under terms of state's social security agreement, and (2) even if residents were employees, they were excluded from agreement as students.

Affirmed.

**1. Administrative Law and Procedure**
⚷754.1, 763

Administrative agency generally has considerable discretion in carrying out mandates of statutes it is entrusted to administer, and Court of Appeals must defer to

agency's decision so long as it is not arbitrary, capricious, an abuse of discretion, or otherwise not supported by law.

**2. Internal Revenue ⚖369**

Medical residents enrolled in state university's graduate medical education program were not "employees" of university under terms of state's modified agreement with federal government, which was contractual in nature, to enroll certain state employees in social security system. Social Security Act, § 218, as amended, 42 U.S.C.A. § 418.

See publication Words and Phrases for other judicial constructions and definitions.

**3. Eminent Domain ⚖2(1.1)**

Contractual terms subject to modification by Congress, in federal-state agreement, do not rise to level of property interest for purpose of Fifth Amendment's takings clause. U.S.C.A. Const.Amend. 5.

**4. Constitutional Law ⚖70.1(7.1), 77**

Meaning of federal-state agreements to enroll state employees in social security program cannot be altered through ruling by the Social Security Administration or through subsequent case law developments; rather, power to alter terms of such agreements lies exclusively with Congress. Social Security Act, § 218, as amended, 42 U.S.C.A. § 418.

**5. Internal Revenue ⚖369**

Even if medical residents enrolled in state university's graduate medical education program were "employees" of university, for purpose of state's agreement to enroll certain employees in social security program, residents were excluded from social security agreement as students, because residents' participation in residency program was primarily educational, not to earn a living. Social Security Act, §§ 210(a)(10), 218, as amended, 42 U.S.C.A. §§ 410(a)(10), 418(c)(5); 20 C.F.R. § 404.1028(c).

1. The HONORABLE RICHARD W. GOLDBERG, Judge, United States Court of International Trade, sitting by designation.

2. The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

**6. Social Security and Public Welfare ⚖6**

Social Security Rulings, although entitled to deference, are not binding or conclusive, and such rulings have neither the force nor effect of law or Congressionally promulgated regulations.

**7. Social Security and Public Welfare ⚖8.20**

Court of Appeals will not defer to social security rulings that are plainly erroneous or inconsistent with Social Security Act or regulations. Social Security Act, § 1 et seq., 42 U.S.C.A. § 301 et seq.

---

Frank W. Rosenfeld, Washington, DC, argued (Frank W. Hunger, David L. Lillehaug and William Kanter, Washington, DC, on the brief), for Appellant.

Thomas W. Tinkham, Minneapolis, MN, argued (John W. Windhorst, Jr., William R. Goetz, William P. Donohue and Mark B. Rotenberg, Minneapolis, MN, on the brief), for Appellee.

Before WOLLMAN and HANSEN, Circuit Judges, and GOLDBERG,[1] Judge.

WOLLMAN, Circuit Judge.

This case involves an assessment issued by the Commissioner of Social Security against the State of Minnesota for unpaid social security contributions attributable to stipends paid to medical residents enrolled in the graduate medical education program at the University of Minnesota during 1985 and 1986. Following the issuance of the assessment, the State initiated an action seeking a redetermination of liability. The district court[2] granted summary judgment in favor of the State. We affirm.

### I.

The inception of the social security system can be traced to the adoption of the Social Security Act of 1935, 49 Stat. 620, as amended, 42 U.S.C. § 301 et seq. (1982 & Supp. II 1984).[3] At that time, there was some ques-

3. In order to reflect the Act as it existed during the years 1985 and 1986, all statutory references are to the 1982 United States Code.

tion as to whether it would be constitutionally permissible for Congress to compel the states and their political subdivisions to participate in the system. For this reason, the Act initially excluded state employees from the scope of its coverage. *See* 42 U.S.C. § 410(a)(7). In 1950, however, Congress enacted section 418, which allows states and their political subdivisions to voluntarily participate in the system by executing an agreement with the Commissioner. *See* 42 U.S.C. § 418(a)(1).[4] If a state enters into a section 418 agreement, covered employees and their employing agencies become subject to the payment of social security contributions and, in return, the employees earn credit toward social security old age and disability benefits.

To a certain extent, states have the ability to define the contours of their section 418 agreements. For example, states may designate particular groups of employees for coverage. However, the provisions of the agreement may not be "inconsistent with the provisions of" section 418. *See* 42 U.S.C. § 418(a)(1). In addition, section 418 provides for certain coverage exclusions, some of which are mandatory and some of which are optional. Among the optional exclusions is an exclusion for "any agricultural labor," or service performed by a student, designated by the State." *See* 42 U.S.C. § 418(c)(5). Section 418 also provides that agreements may be modified at any time to extend coverage to additional groups of state employees. *See* 42 U.S.C. § 418(c)(4).

Minnesota executed its section 418 agreement in 1955. *See* Administrative Record (A.R.) at 1. Initially, this agreement applied to only a few limited coverage groups. Shortly following the initial agreement, a number of subsequent modifications were executed in order to extend coverage to various other groups. In 1958, the State executed a modification adding "[s]ervices performed by

individuals as employees" of the University of Minnesota "as an additional coverage group." A.R. at 13. This modification listed several exclusions, one of which, consistent with section 418(c)(5), excluded "[a]ny service performed by a student." A.R. at 13.

For more than thirty years after execution of the 1958 modification, the University did not withhold social security contributions from stipends paid to medical residents at its teaching hospital; nor did it pay the employer's share of contributions. This practice was consistent with the University's belief that medical residents were not included in the coverage group identified by the 1958 modification. In 1989, the Social Security Administration (SSA) initiated an investigation of the treatment of medical residents under the State's section 418 agreement. On September 13, 1990, the SSA issued a formal notice of statutory assessment asserting that the State was liable for unpaid social security contributions totaling nearly $8 million and that such contributions were attributable to stipends paid to medical residents during the years 1985 and 1986. The State sought review of this assessment on administrative appeal, and the assessment was affirmed without modification on December 8, 1993.

The State then filed a civil action in district court pursuant to 42 U.S.C. § 418(t),[5] seeking a redetermination of the assessment. Both the State and the Commissioner filed motions for summary judgment. In addition, each party stipulated that the correct amount of the assessment, if valid, was approximately $4.7 million.[6] The district court granted the State's motion for summary judgment and overturned the assessment. In doing so, the court relied upon alternative grounds. First, it held that the medical residents were not "employees" of the University within the meaning of the 1958 modification. Second, it

4. Under section 418, agreements were initially executed between the states and the Department of Health, Education, and Welfare. This department was subsequently supplanted by the Department of Health and Human Services, which was in turn succeeded by the Social Security Administration.

5. This section was repealed in 1986, *see* P.L. 99–509, § 9002(c)(1). It permitted states to seek

judicial review of an SSA assessment by filing "a civil action for a redetermination of the correctness of the assessment of the amount due."

6. Apparently, the original assessment of nearly $8 million was based on estimated information rather than the University's payroll records.

concluded that, even if the residents were employees under the terms of the modification, they were excluded from coverage under the modification's student exclusion. The Commissioner now appeals.

## II.

We review a grant of summary judgment *de novo*, applying the same standard as that employed by the district court. *See Rose-Maston v. NME Hospitals, Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates the absence of any genuine issue of material fact so that the moving party is entitled to judgment as a matter of law. *See id.;* Fed.R.Civ.P. 56(c).

[1] Generally, an administrative agency has considerable discretion in carrying out the mandates of statutes it is entrusted to administer. *See Mausolf v. Babbitt,* 125 F.3d 661, 667 (8th Cir.1997), *cert. denied,* ––– U.S. –––, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998). We must defer to the agency's decision so long as it "is not 'arbitrary, capricious, an abuse of discretion, or otherwise not supported by law.'" *Reder v. Administrator of Fed. Aviation Admin.,* 116 F.3d 1261, 1263 (8th Cir.1997) (quoting *Trans–Allied Audit Co., Inc. v. Interstate Commerce Comm'n,* 33 F.3d 1024, 1030 (8th Cir.1994)).

The State, noting that section 418(t) provided for a "redetermination" of the assessment, urges us to disregard this deferential standard in favor of a more probing review. Whatever the merits of this argument, we conclude that the Commissioner's decision to uphold the assessment finds no support in

law or fact and consequently fails to survive even the most deferential standard of review.

### A.

[2] The first of the district court's alternative holdings was that the residents were not "employees" of the University as that term is used in the 1958 modification. The court reasoned that the 1958 modification was a contract and that its terms must be interpreted by giving effect to the intent of the parties. The court further concluded that uncontroverted evidence demonstrated that when the parties executed the modification, they did not intend to extend coverage to the medical residents [7] and that this intent was controlling regardless of post–1958 case law holding that medical residents are employees.[8]

The Commissioner does not seriously dispute the district court's conclusion that the parties did not contemplate extending coverage to residents when they executed the 1958 modification. Rather, he contends that the modification is not contractual in nature and that the parties' intent in 1958 is irrelevant. In support of this proposition, the Commissioner relies on the Supreme Court's decision in *Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). *Bowen* involved a section 418 agreement executed in 1951 by the State of California. *See id.* at 48, 106 S.Ct. 2390. The agreement contained a provision, authorized by section 418(g), permitting California to terminate its section 418 agreement by giving at least two years' written notice. *See id.* at 48–49, 106 S.Ct. 2390. In 1983, however, Congress amended section 418(g) to prohibit states from terminating section 418 agreements "on or after April 20,

---

7. This determination is supported by a number of factors. First, the 1958 modification expressly stated that it was intended to cover 225 employees. In the fall of 1958, there were 422 medical residents enrolled at the University of Minnesota. Second, minutes from a meeting of the Board of Regents indicate that the modification was intended to cover certain faculty positions only. Third, an Internal Revenue Service Ruling issued prior to the modification indicated that stipends paid to medical residents were excluded from wages because such stipends were paid primarily to further the residents' education and training. *See* Rev. Rul. 57–560 (1957). Finally, the University had consistently treated the residents' stipends as excluded from coverage for more than thirty years.

8. For example, since 1958, various courts have concluded that, for federal income tax purposes, medical residents are considered employees. *See, e.g., Rockswold v. United States,* 620 F.2d 166, 169 (8th Cir.1980); *Parr v. United States,* 469 F.2d 1156, 1158 (5th Cir.1972); *Hembree v. United States,* 464 F.2d 1262, 1264 (4th Cir. 1972).

1983." 42 U.S.C. § 418(g). That amendment prevented states from withdrawing from the system even if a termination notice had already been filed. *See Bowen,* 477 U.S. at 48, 106 S.Ct. 2390. At the time of the amendment, California had filed termination notices for a number of its employees. *See id.* at 49, 106 S.Ct. 2390. When the amendment prevented these notices from taking effect, the state initiated proceedings to challenge the validity of the amendment. *See id.* California argued that the right to terminate coverage for its employees was a contractual right and that the amendment deprived them of this right without just compensation in violation of the Fifth Amendment. *See id.*

The Supreme Court rejected this argument, concluding that amended section 418(g) did not constitute a taking of property within the meaning of the Fifth Amendment. *See id.* at 55–56, 106 S.Ct. 2390. The Court first noted that in enacting the Social Security Act, Congress had anticipated the need to be flexible in responding to changing social and economic conditions. *See id.* at 51–52, 106 S.Ct. 2390. For this reason, Congress expressly included a provision reserving "[t]he right to alter, amend, or repeal any provision of" the Act. *Id.* 42, 106 S.Ct. 2390 U.S.C. § 1304. In light of this express reservation of authority, the Court stated that "courts should be extremely reluctant to construe § 418 Agreements in a manner that forecloses Congress' exercise of that authority." *Id.* at 52, 106 S.Ct. 2390.

The Court concluded that because Congress had expressly reserved the power to amend section 418, it also retained concurrent power to affect the terms of agreements entered into pursuant to that section. *See id.* at 53–54, 106 S.Ct. 2390. As the Court explained, "The State accepted the Agreement under an Act that contained the language of reservation. That language expressly notified the State that Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself." *Id.* at 54, 106 S.Ct. 2390.

The Court further held that any "contractual right" created by the agreement's termination clause did not rise to the level of "property" under the Fifth Amendment. *See id.* at 55, 106 S.Ct. 2390. The Court explained that the agreement's termination clause "simply cannot be viewed as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation." *Id.* at 55, 106 S.Ct. 2390. Thus, the Court held that amended section 418(g) was not an unconstitutional appropriation of property under the Fifth Amendment. *See id.* at 55–56, 106 S.Ct. 2390.

Relying on *Bowen,* the Commissioner argues that section 418 agreements are not contracts at all but are instead merely written evidence that a state has exercised its statutory option to participate in the social security program. We reject this interpretation. Although *Bowen* holds that section 418 agreements are subject to modification by Congress, it does not broadly dismiss such agreements as non-contractual. To the contrary, the Court's decision is replete with references to "contractual arrangements." Indeed, the backdrop against which the Court examined California's assertions was that "contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Id.* at 52–53, 106 S.Ct. 2390. Thus, far from holding that section 418 agreements are non-contractual, the Court in *Bowen* actually assumed that such agreements are contracts. This assumption is further supported by section 120 of the Commissioner's Handbook for State Social Security Administrators, which recognizes that "[e]ach modification, like the original agreement, is a Federal–State contract."

[3] The Commissioner argues that because *Bowen* concluded that California's section 418 agreement did not confer a Fifth Amendment property interest, the underlying agreement cannot be considered a contract. This argument distorts the Court's analysis, which merely recognized that some contractual rights are not necessarily property interests within the meaning of the Fifth Amendment. In particular, contractual terms subject to modification by Congress do not rise to the level of a Fifth Amendment property interest. *See Bowen,* 477

U.S. at 51–52, 106 S.Ct. 2390; *Education Assistance Corp. v. Cavazos*, 902 F.2d 617, 628 (8th Cir.1990) ("Whether a contractual right against the United States constitutes a vested property right for fifth amendment purposes depends on whether Congress reserved power to alter the terms of the contract"). It does not follow that such terms are not contractual in nature.

[4] Nevertheless, the Commissioner insists that the definition of "employee" has been construed since 1958 to include medical residents and that this definition should control regardless of the parties' original intent and understanding. As the district court pointed out, however, the meaning of section 418 agreements cannot be altered "through ruling by the the [sic] SSA or through subsequent case law developments regarding the employment status of medical residents." Memorandum Opinion & Order at 12. The power to alter the terms of section 418 agreements lies exclusively with Congress. Because Congress has not chosen to alter or amend the meaning of the State's 1958 modification, the parties' intent is controlling. *See Enos v. Key Pharmaceuticals, Inc.*, 106 F.3d 838, 839 (8th Cir.1997); *Frank B. Hall & Co., Inc. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1023 (8th Cir.1992). Accordingly, we agree with the district court that the residents were not employees of the University under the terms of the 1958 contract.

**B.**

[5] The district court held, alternatively, that even if medical residents were considered "employees" under the terms of the 1958 modification, the residents are excluded from coverage under the agreement's student exclusion. As noted above, the student exclusion is authorized by section 418(c)(5), which provides that "[s]uch agreement shall, if the State requests it, exclude (in the case of any coverage group) any agricultural labor, or service performed by a student, designated by the State." 42 U.S.C. § 418(c)(5). Section 418(c)(5) also cross-references the Act's general student exclusion, section 410(a)(10), which applies to service performed in the employ of a school, college, or university "if such service is performed by a

student who is enrolled and regularly attending classes at such school, college, or university." 42 U.S.C. § 410(a)(10).

In arguing that the residents do not qualify for the student exclusion, the Commissioner relies principally upon *Rockswold v. United States*, 620 F.2d 166 (8th Cir.1980). In *Rockswold*, we concluded that stipends paid to residents at the University of Minnesota's teaching hospital constituted payment for services rather than scholarships or fellowship grants and that such stipends were therefore not excludable from the residents' gross income for income tax purposes. *See id.* at 169. Our focus was on the nature of the stipends paid to the residents; thus, the "threshold question" was "whether the payment was made as quid pro quo for the services rendered." *Id.* Because we found that the payments were intended to compensate residents for services they rendered, we concluded that the payments were not scholarships or fellowship grants. *See id.*

In the present case, however, we focus not on the nature of the payments made to the residents but on the nature of the residents' relationship with the University. The regulation implementing the student exclusion provides: "Whether you are a student for purposes of this section depends on your relationship with your employer. If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student and your work is not considered employment." *See* 20 C.F.R. § 404.1028(c). Thus, if the residents' participation in the University's residency program is primarily educational, the residents should be considered students. If their purpose is to earn a living, however, they do not fit within the definition of the student exclusion.

The fact that payments received by the residents constitute taxable income does not mean that the primary purpose of their relationship with the University is not educational. We recognized as much in *Rockswold*, despite our ultimate conclusion that the stipends paid to the residents represented a *quid pro quo* for services rendered. Specifically, we noted that the University's residency program "is designed to educate and train physicians so that they can pursue careers in

academic medicine and medical research." *Id.* at 167; *see also Parr,* 469 F.2d at 1157 (although teaching hospital was "operated primarily for the purpose of training doctors," payments made to residents were primarily compensatory); *Hembree,* 464 F.2d at 1264 (although primary purpose of teaching hospital was training of physicians rather than treatment of patients, payments made to residents were primarily compensatory). The Commissioner acknowledges this distinction, but maintains that in this case there is no logical reason to distinguish between the purpose of the payments and the purpose of the relationship because the purpose of each is the same. The undisputed facts make it clear, however, that the primary purpose for the residents' participation in the program is to pursue a course of study rather than to earn a livelihood. *See* 20 C.F.R. § 404.1028(c). The residents are enrolled at the University, pay tuition, and are registered for approximately fifteen credit hours per semester. Although they provide patient services while working at the hospital, it does not follow that they are enrolled primarily to earn a livelihood.[9]

[6, 7] Finally, the Commissioner urges us to defer to Social Security Ruling 78–3, which states that "the Social Security Administration has always held that resident physicians are not students." SSR 78–3. Social Security Rulings, although entitled to deference, are not binding or conclusive. *Newton v. Chater,* 92 F.3d 688, 693 (8th Cir.1996). Such rulings "have neither the force nor effect of law or Congressionally promulgated regulations." *See id.* Thus, we will not defer to rulings that are "plainly erroneous or inconsistent with the Act or regulations." *Chavez v. Department of Health & Human Serv.,* 103 F.3d 849, 851 (9th Cir.1996). The bright-line rule of SSR 78–3 is inconsistent with the approach set forth at 20 C.F.R. § 404.1028(c), which contemplates a case-by-case examination to determine if an individu-

al's relationship with a school is primarily for educational purposes or primarily to earn a living. The Commissioner cannot avoid such a case-by-case examination by summarily concluding that medical residents are never students, regardless of the nature of their relationship with their employer.

The judgment is affirmed.



METAL SHOP, WAREHOUSEMEN, AND HELPERS UNION, LOCAL 970, A Labor Organization, Appellant,

v.

B.F. NELSON FOLDING CARTONS, INC., A Corporation, Appellee.

No. 97–4059.

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1998.

Decided July 20, 1998.

Union brought action seeking confirmation of arbitrator's decision requiring employer to reinstate two employees to their previous jobs upon their return from strike, and to post position sought by a third employee upon his return from strike. Employer counterclaimed, asking that arbitrator's decision be set aside. The United States District Court for the District of Minnesota, Richard H. Kyle, J., confirmed award as to first employee, vacated award as to second employee, and vacated order to post position sought by third employee. Union appealed. The Court of Appeals, Morris Sheppard Arnold, Circuit Judge, held that: (1) decision, that job assign-

---

9. The Commissioner contends that the stipends, which ranged from $20,000 to $28,000 per year, constituted "an amount far above what one would ordinarily think of as a scholarship." *Appellant's Brief* at 30. This argument misstates the issue. The question is not whether stipends paid to the residents were scholarships—indeed,

the State concedes that they were not. Rather, the question is whether the residents were students within the meaning of the student exclusion. This question depends not on the nature of the stipends but on the nature of the residents' relationship with the University.

**EXHIBIT B**

| Form **843** | **Claim for Refund and Request for Abatement** | |
|---|---|---|
| (Rev. November 2005)<br>Department of the Treasury<br>Internal Revenue Service | ▶ See separate Instructions. | OMB No. 1545-0024 |

Use Form 843 only if your claim involves **(a)** one of the taxes shown on line 3a or **(b)** a refund or abatement of interest, penalties, or additions to tax on line 4a.

**Do not** use Form 843 if your claim is for—
- An overpayment of income taxes;
- A refund for nontaxable use (or sales) of fuel; or
- An overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| Type or print | | |
|---|---|---|
| Name of claimant<br>**Regents of the University of Minnesota** | Your SSN or ITIN | |
| Address (number, street, and room or suite no.)<br>**1300 South 2nd Street, Suite 206** | Spouse's SSN or ITIN | |
| City or town, state, and ZIP code<br>**Minneapolis, MN 55454** | Employer identification number (EIN)<br>**41 : 6007513** | |
| Name and address shown on return if different from above | Daytime telephone number<br>( **612** ) **624-1053** | |

**1** **Period.** Prepare a separate Form 843 for each tax period
From **04 / 01 / 2005** to **06 / 30 / 2005**

**2** Amount to be refunded or abated
$ **1,094,803.92**

**3a** Type of tax, penalty, or addition to tax:
☑ Employment   ☐ Estate   ☐ Gift   ☐ Excise (see instructions)
☐ Penalty—IRC section ▶ _____

**b** Type of return filed (see instructions):
☐ 706   ☐ 709   ☐ 940   ☑ 941   ☐ 943   ☐ 945   ☐ 990-PF   ☐ 4720   ☐ Other (specify)

**4a** Request for abatement or refund of:
☐ Interest as a result of IRS errors or delays.
☐ A penalty or addition to tax as a result of erroneous advice from the IRS.

**b** Dates of payment ▶ _____

**5** **Explanation and additional claims.** Explain why you believe this claim should be allowed, and show the computation of your tax refund or abatement of interest, penalty, or addition to tax. If you need more space, attach additional sheets.

**See attached**

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the signature must be accompanied by the officer's title.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete.

_____   CFO, Treasurer, VP Finance   3/9/06
Signature (Title, if applicable. Claims by corporations must be signed by an officer.)   Date

_____   _____
Signature   Date

For Privacy Act and Paperwork Reduction Act Notice, see separate Instructions.   Cat. No. 10180R   Form **843** (Rev. 11-2005)

Form **941c**

(Rev. October 2003)
Department of the Treasury
Internal Revenue Service

**Supporting Statement To Correct Information**

**Do Not File Separately**

▶ **File with Forms 941, 941-M, 941-SS, 943, 945, or Form 843.**

OMB No. 1545-0256

Page
No.

| Name | Employer identification number |
|---|---|
| Regents of the University of Minnesota | 41-6007513 |

| Telephone number (optional) | **A** This form supports adjustments to: **Check only one box. (see instructions)** |
|---|---|

**A** This form supports adjustments to: **Check only one box. (see instructions)**

[X] Form 941    [ ] Form 941-SS    [ ] Form 945
[ ] Form 941-M    [ ] Form 943

**B** This form is **attached to** and filed with the return for the period ending (month, year) ▶

**C** Enter the date that you discovered the error(s) reported on this form. (If you are making more than one correction and the errors were not discovered at the same time, explain in Part V.) . . . . . . . . . . . ▶

**Part I**    **Signature and Certification (You must** complete this part for the IRS to process your adjustments for overpayments.) Skip Part I if all of your adjustments are underpayments. **(Part I applies to wages only.)**

I certify that Forms W-2c, Corrected Wage and Tax Statement, have been filed (as necessary) with the Social Security Administration, and that (check appropriate boxes):

[ ] All overcollected income taxes for the current calendar year and all social security and Medicare taxes for the current and prior calendar years have been **repaid** to employees. For claims of overcollected employee social security and Medicare taxes in earlier years, a written statement has been obtained from each employee stating that the employee has not claimed and will not claim refund or credit of the amount of the overcollection.

[X] All affected employees have given their **written consent** to the allowance of this credit or refund. For claims of overcollected employee social security and Medicare taxes in earlier years, a written statement has been obtained from each employee stating that the employee has not claimed and will not claim refund or credit of the amount of the overcollection.

[ ] The social security tax and Medicare tax adjustments represent the **employer's share only.** An attempt was made to locate the employee(s) affected, but the affected employee(s) could not be located or will not comply with the certification requirements.

[ ] None of this refund or credit was withheld from employee wages.

**Sign Here**

Signature ▶      Title ▶      Date ▶

**Part II**    **Income Tax Withholding (Including Backup Withholding) Adjustment**

| | (a) Period Corrected (For quarterly returns, enter date quarter ended. For annual returns, enter year.) | (b) Withheld Income Tax Previously Reported for Period | (c) Correct Withheld Income Tax for Period | (d) Withheld Income Tax Adjustment |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | **Net withheld income tax adjustment.** If more than one page, enter total of **all** columns (d) on first page only. Enter here and on the **appropriate** line of the return with which you file this form. ▶ | | **5** | |

**Part III**    **Social Security Tax Adjustment** (Use the tax rate in effect during the period(s) corrected. You must also complete Part IV.)

| | (a) Period Corrected (For quarterly returns, enter date quarter ended. For annual returns, enter year.) | (b) Wages Previously Reported for Period | (c) Correct Wages for Period | (d) Tips Previously Reported for Period | (e) Correct Tips for Period | (f) Social Security Tax Adjustment |
|---|---|---|---|---|---|---|
| 1 | June 30, 2005 | 226,719,906.61 | 219,564,317.54 | | | (887,293.30) |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | **Totals.** If more than one page, enter totals on first page only ▶ | 226,719,906.61 | 219,564,317.54 | | | (887,293.30) |
| 6 | **Net social security tax adjustment.** If more than one page, enter total of **all** columns (f) on first page only. Enter here and on the appropriate line of the return with which you file this form ▶ | | | | **6** | (887,293.30) |
| 7 | **Net wage adjustment.** If more than one page, enter total of **all** lines 7 on first page only. If line 5(c) is smaller than line 5(b), enter difference in parentheses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | | | | **7** | (7,155,589.07) |
| 8 | **Net tip adjustment.** If more than one page, enter total of **all** lines 8 on first page only. If line 5(e) is smaller than line 5(d), enter difference in parentheses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ | | | | **8** | |

For Paperwork Reduction Act Notice, see page 4.

Form **941c** (Rev. 10-2003)

ISA
STF FED1753F.1

Form 941c (Rev. 10-2003)                                                                                          Page **2**

### Part IV    Medicare Tax Adjustment

| (a)<br>Period Corrected (For quarterly returns, enter date quarter ended. For annual returns, enter year.) | | (b)<br>Wages and Tips Previously Reported for Period | (c)<br>Correct Wages and Tips for Period | (d)<br>Medicare Tax Adjustment |
|---|---|---|---|---|
| **1** June 30, 2005 | | 239,898,595.86 | 232,743,006.79 | (207,510.62) |
| **2** | | | | |
| **3** | | | | |
| **4** | | | | |
| **5** Totals. If more than one page, enter totals on first page only . . . ▶ | | 239,898,595.86 | 232,743,006.79 | (207,510.62) |

| | | |
|---|---|---|
| **6** Net Medicare tax adjustment. If more than one page, enter total of all columns (d) on first page only. Enter here and on the appropriate line of the return with which you file this form . . . . . . . ▶ | **6** | (207,510.62) |
| **7** Net wage and tip adjustment. If more than one page, enter total of all lines 7 on first page only. If line 5(c) is smaller than line 5(b), enter difference in parentheses . . . . . . . . . . . . . . . . . . . . . ▶ | **7** | (7,155,589.07) |

### Part V    Explanation of Adjustments

See Attached

STF FED1753F.2

**ATTACHMENT TO FORM 843**
CLAIM FOR REFUND AND REQUEST FOR ABATEMENT
FOR PERIOD FROM
APRIL 1, 2005 THROUGH JUNE 30, 2005
UNIVERSITY OF MINNESOTA
EMPLOYMENT TAXES (FORM 941)
41-6007513

## Line 5–Explanation and Additional Claims

The University of Minnesota ("University") claims a refund of FICA taxes it withheld and paid with respect to stipends paid to medical residents enrolled in graduate medical education programs at the University during the second quarter of 2005 (April 1 through June 30).

In 1998, the U.S. Court of Appeals for the Eighth Circuit held that the stipends paid to medical residents at the University in 1985 and 1986 were not subject to social security contributions because the residents were excluded from social security coverage as "students" within the meaning of Section 210(a)(10) of the Social Security Act ("Act") (42 U.S.C. § 410(a)(10)) pursuant to an election by the University in its Section 218 Agreement under Section 218(c)(5) of the Act (42 U.S.C. § 418(c)(5)). See State of Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998), acq. SSA Acquiescence Ruling 98-5(8), 63 Fed. Reg. 58444 (Oct. 30, 1998) (as applied to 8th Circuit).

On the basis of the Apfel decision, the Internal Revenue Service ("IRS") allowed refund claims filed by the University with respect to FICA taxes paid on medical residents' stipends from October 1, 1990 through June 30, 1998 and the University discontinued withholding and payment of FICA taxes with respect to such stipends.

On December 21, 2004, the IRS adopted amendments to Treas. Regs. § 31.3121(b)(10)-2 concerning the "student" exception to "employment" for purposes of FICA coverage under Section 3121(b)(10) of the Code, a provision identical to Section 210(a)(10) of the Act. See T.D. 9167, 69 F.R. 76404 (Dec. 21, 2004) ("Amended Regulations"). The Amended Regulations significantly alter the prior regulations' test for "student" status. They provide, in part, that a "full-time" worker does not qualify as a "student" and that the "service" aspect of a relationship between an individual and the entity for which he or she works is not affected by the fact that the services performed may have an "educational" aspect. In addition, an example in the Amended Regulations (Treas. Reg. § 31.3121(b)(10)-2(e), Ex. 4) states that a medical resident does not qualify as a "student." The Amended Regulations are effective for services performed on or after April 1, 2005.

The Amended Regulations apply generally by their terms, and there is no indication that they are not intended to apply to the University because of the Apfel decision. Therefore, the University began to withhold and pay FICA with respect to the stipends it pays to its medical residents as of April 1, 2005. The relevant facts concerning the University medical residency program during the second quarter of 2005 were identical in all material respects to the facts in Apfel.

The University contends that the Amended Regulations are invalid to the extent they provide, without requiring a consideration of all relevant facts and circumstances, that medical residents cannot qualify for the "student" exclusion because they are "full-time" employees (as defined in the Amended Regulations). This portion of the Amended Regulations is invalid because it is an arbitrary, capricious and unreasonable interpretation of Section 3121(b)(10) of the Code and exceeds the regulatory authority of the Secretary of the Treasury under Section 7805 of the Code and because it conflicts with the related SSA benefit regulation under the Act (20 C.F.R. § 404.1028(c)). To the extent, moreover, that the Amended Regulations are valid as generally applied, collateral estoppel and stare decisis principles require that they be applied to the University consistently with Apfel. Accordingly, the stipends paid to the University's medical residents during the second quarter of 2005 are excluded from FICA coverage under Section 3121(b)(10) of the Code notwithstanding the adoption of the Amended Regulations.

<u>Compliance with Treas. Reg. § 31.6402(a)-2(a)(2)</u>

Pursuant to Treas. Reg. § 31.6402(a)-2(a)(2) and Rev. Proc. 81-69, 1981-2 C.B. 726, the University has solicited consents from the medical residents to the University's filing of these claims for refund of the employee portion of the FICA contribution by sending consent forms by first-class U.S. mail to each resident at his or her last known address. In addition to providing for a consent to the University's filing of the refund claim, the consent forms state that (a) the resident has not claimed a refund or credit of the amount of the overpayment and (b) the resident will not claim a refund or credit of such amount.

The University is in the process of receiving back the signed consent forms. At the time of the filing of this claim, not all of the consent forms have been received. As described below, the University is including in support of this refund claim complete information concerning each medical resident with respect to whose stipends it is claiming a refund of FICA taxes, including name, social security number, and the amount of wages paid during the employment tax quarter for which the refund claim is being filed. Pending final audit of the claim, the total amount of the claim includes both the employer and the employee portions of the FICA taxes for all of the residents covered by the claim and identified in the accompanying schedule, whether or not consents have been received.

These claims thus constitute protective refund claims on behalf of all medical residents, including those from whom the University has not yet received signed consents, under the principles of *Chicago Milwaukee Corp. v. U.S.*, 40 F.3d 373 (Fed. Cir. 1994), and G.C.M. 38786 (Aug. 13, 1981). Before the present claim is paid (if allowed), the University will present complete information concerning those residents from whom it has received valid consents, and will request a refund of the employee portion of the FICA only with respect to those residents who have furnished valid consents. These refund claims will also protect the rights of the non-consenting residents to file individual claims for refund of the portions of FICA taxes withheld from their stipends should they wish to do so in the future. *See* Rev. Rul. 83-79, 1983-1 C.B. 346; *Mills v. Commissioner*, 890 F.2d 1133 (11th Cir. 1989).

Computation of Tax Refund

Attached to Form 843 is a schedule giving complete detail for the stipends paid to medical residents at the University during the refund claim period (the second quarter of 2005). In addition to the name and social security number of the resident, the schedule shows the amount of the stipend paid to the resident and the amount of the employee and employer portions of FICA tax withheld and paid to the IRS with respect to that stipend.

Computation of Interest on Refund

1.   The IRS has held that the University is not a "corporation" within the meaning of the Code and specifically for purposes of interest-rate computations under Section 6621 of the Code. See TAM 200126032 (July 2, 2001).   Accordingly, interest on the entire refund should be computed at the noncorporate overpayment rate.

2.   Since the return (Form 941) for this period was timely filed, interest on the refund should be computed from the end of the first month following the end of the period (i.e., from July 31, 2005).

4827-8625-5104\5

| University of Minnesota<br>EIN 41-6007513 | Summary Information For IRS Form 843<br>Claim for Refund and Request for Abatement | Page 1 of 1<br>10/4/2005 10:56 AM |
|---|---|---|

| **2005** | **2nd QUARTER** |
|---|---|
| OASDI GROSS | 7,155,589.07 |
| OASDI EE TAX | **443,646.65** |
| OASDI ER TAX | 443,646.65 |
| TOTAL ER/EE TAX | 887,293.30 |
| | |
| MEDICARE GROSS | 7,155,589.07 |
| MEDICARE EE TAX | **103,755.31** |
| MEDICARE ER TAX | 103,755.31 |
| TOTAL ER/EE TAX | 207,510.62 |
| | |
| TOTAL EE TAX | **547,401.96** |
| TOTAL ER TAX | 547,401.96 |
| TOTAL ER/EE TAX | 1,094,803.92 |

| 2nd Quarter 941c | Previous Wages | Correct Wages | Tax Adjustment | Net Wage<br>Adjustment |
|---|---|---|---|---|
| OASDI | 226,719,906.61 | 219,564,317.54 | -887,293.30 | -7,155,589.07 |
| Medicare | 239,898,595.86 | 232,743,006.79 | -207,510.62 | -7,155,589.07 |

**Form 843**                                                    -1,094,803.92

```
        MINNEAPOLIS MAIN OFFICE WINDOW
             MINNEAPOLIS, Minnesota
                   554019609
                2663650487-0094
03/09/2006       (800)275-8777      02:01:40 PM

          ─── Sales Receipt ───
Product          Sale    Unit      Final
Description       Qty    Price     Price

39c Stamp          1     $0.39     $0.39
OGDEN UT 84201                     $1.83
First-Class
6.50 oz.
  Return Rcpt (Green Card)         $1.85
  Certified                       $2.40
  Label #:     7003168000040584540
                                 ========
          Issue PVI:             $6.08

Total:                           ─────
                                 $6.47

Paid by:
MasterCard                        $5.47
   Account #        XXXXXXXXXXXX7138
   Approval #:          039948
   Transaction #:       648
   23 903341071

Order stamps at USPS.com/shop or call
1-800-Stamp24.  Go to
USPS.com/clicknship to print shipping
labels with postage.  For other
information call 1-800-ASK-USPS.
Bill#:  1000601817009
Clerk:  19


─ All sales final on stamps and postage. ─
     Refunds for guaranteed services only.
        Thank you for your business.
              Customer Copy
```



**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

INTERNAL REVENUE SERVICE
Ogden, VT 84201-0005

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature

RECEIVED
MAR 2008
OGDEN, UT

☐ Agent
☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
7003 1680 0004 0584 3540

PS Form 3811, July 1999       Domestic Return Receipt       102595-00-M-0952

**EXHIBIT C**

# Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
**(Cite as: 1997 WL 33352908 (D.Minn.))**

▷
Only the Westlaw citation is currently available.

United States District Court, D. Minnesota.
STATE of Minnesota, Plaintiff,
v.
Shirley S. CHATER, Commissioner of Social
Security, and Social Security
Administration, Defendants.
**No. Civ. 4-96-756.**

May 21, 1997.
John W. Windhorst, Jr., Thomas Tinkham, and
William R. Goetz,   Dorsey & Whitney, L.L.P.,
Minneapolis, Minnesota, and William P. Donohue,
Special Attorney and mark B. Rotenberg, General
Counsel   for   the   University   of   Minnesota,
Minneapolis, Minnesota, for Plaintiff.

Lonnie F. Bryan, Assistant United States Attorney,
Minneapolis, Minnesota for Defendants.

MEMORANDUM OPINION AND ORDER

MONTGOMERY, J.

Introduction
*1 This case challenges the applicability of social
security coverage of stipends paid by the University
of Minnesota to medical residents in the years 1985
and 1986. On January 11, 1994, the Commissioner
affirmed an assessment dated September 13, 1990
("Assessment") of   additional   social   security
contributions for 1985 and 1986. These funds were
allegedly due from the State under a 1958 agreement
("Section 218 Agreement") between the State and the
Secretary of Health, Education and Welfare made
pursuant to Section 218 of the Social Security Act, as
amended ("Act")("42 U.S.C. § 418") relating to the
social security coverage of medical residents at the
University   of   Minnesota   ("University").   See
Administrative   Record   ("AR")   275-277.   The
Assessment asserts that the State is liable for social
security contributions of $3,951,158.40 for 1985 and
$4,007,203.20 for 1986 attributable to stipends paid
by the University to medical residents and not
reported by the University. [FN1] In this action, the
State seeks a redetermination of the correctness of the
Commissioner's decision under 42 U.S.C. § 418(t).
Jurisdiction is bestowed upon this Court by 42 U.S.C.

§  418(t)(1). [FN2] This matter is before the Court on
the parties cross-motions for summary judgment. For
the reasons set forth below, the Court will grant the
State's motion and deny the Commissioner's motion.

> FN1. The assessed amounts were based on
> estimated   information,   not   on   the
> University's   actual   payroll   records.   On
> September 24, 1996, the parties filed a
> stipulation in which they agreed that if the
> Assessment   were   held   to   be   valid,   the
> amounts of the social security contributions
> for which the State is liable on the stipends
> paid to the residents would be $2,313,464.92
> for 1985 and $2,379,958.26 for 1986, plus
> interest as provided by statute, plus $290.00
> in health insurance tax and interest as
> assessed by the Internal Revenue Service,
> instead of the amount provided in the
> Assessment.

> FN2. 42 U.S.C. § § 218(s) and 218(t) were
> repealed on October 21, 1986. See Pub.L.
> 99-509, § 9002(c)(1), 100 Stat.1971 (1986).
> However, both provisions apply to this case
> because   they   remain   effective   for
> contributions due prior to January 1, 1987.
> See   Pub.L.   99-509,   §   9002(d),   100
> Stat.1972 (1986).

Background
When the Social Security system was first created in
1935, questions concerning the constitutionality of
imposing such a tax on employees of states and local
governments caused Congress to exclude them from
mandatory participation in the system. However, in
1950, under pressure from the states, Congress
enacted Section 218 of the Act (42 U.S.C. § 418),
which permitted the states to obtain social security
coverage for designated state and local governmental
employees by voluntarily entering into agreements
("Section 218 agreements") with the Secretary of
Health, Education and Welfare ("HEW").

In 1955, the State of Minnesota enacted legislation
authorizing   the   execution   of   a   Section   218
agreement, and on August 29, 1955 the State entered
into a Section 218 Agreement with the Secretary of
HEW. See AR 1-5. The original Agreement did not
apply to any employees of the University of
Minnesota. Thereafter, the State entered into certain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
(Cite as: 1997 WL 33352908 (D.Minn.))

modifications of the Agreement. These modifications extended coverage of the Agreement to additional State and local governmental employees. Modification No. 1 (executed in November/December 1955) covered University employees who were participants in the Faculty Retirement Plan. *See* AR 6. Modification No. 3 (executed in December 1957) covered University employees who were participants in the State Employees Retirement Association. *See* AR 12. Neither Modification No. 1 nor Modification No. 3 applied to medical residents enrolled at the University because they were not participants in the Faculty Retirement Plan or the State Employees Retirement Association.

**\*2** In October/November 1958, Modification No. 8 was executed, extending coverage to "services" performed by "employees" of the University not covered by any public retirement system. *See* AR 13. Modification No. 8 defined the additional "coverage group" [FN3] as follows:

> FN3. For purposes of coverage under Section 218 Agreements, employees were categorized into certain units called "coverage groups."

Services performed by individuals as employees of the following political subdivision of the State of Minnesota, as members of a coverage group (as defined in Section 218(b)(5) of the Social Security Act.)

University of Minnesota

Effective Date of Coverage: July 1, 1958

Excluded Services: All services of an emergency nature

Any service performed by a student

All positions the compensation for which is on a fee basis.

Part-time positions of lecturers, instructors, assistant professors, research fellows and research associates.

*Id.*

The University did not consider that Modification No. 8 covered medical residents and thus did not begin to withhold or pay social security contributions with respect to the residents' stipends after its execution in 1958. For the next 30 plus years, the University maintained its position that residents' stipends were exempt from coverage under the Act.

After some inquires from a former medical resident under the Freedom of Information Act ("FOIA") in 1989, the Social Security Administration ("SSA") began an inquiry into the treatment of residents' stipends at the University. Under 42 U.S.C. § 418(q)(2)(A), the final day for assessment for amounts due with respect to 1985 was April 15, 1989. Prior to that date, SSA requested the State to enter into an agreement under 42 U.S.C. § § 418(q)(4)(A) and 418(r)(2)(A) extending the assessment period to October 15, 1989. On March 30, 1989 and April 3, 1989, the State and the Secretary of Health and Human Services ("HHS"), respectively, executed Extension Agreement No. 36, purportedly extending the assessment period to October 15, 1989. *See* AR 262. Subsequent extension agreements (Extension Agreements 36A and 36B) extended the period to October, 1990. *See* AR 944, 352. The period for assessment with respect to 1986 was similarly extended to October, 1990. *See* Extension Agreement 37, AR 354.

On September 13, 1990, SSA assessed an amount of $7,958,361.60 against the State for contributions allegedly due on stipends paid to medical residents. *See* AR 275-277. The SSA determined that medical residents were covered under Modification No. 8 of the State's Section 218 Agreement. The State requested review of the September 13, 1990 assessment, but the assessment was affirmed on January 11, 1994.

Thereafter, the State filed the instant action seeking a "redetermination of the correctness of the assessment of the amount due" under 42 U.S.C. § 418(t). The State raises three grounds in support of its argument that the Commissioner erred in determining that the State is liable for social security contributions with respect to stipends paid in 1985 and 1986 to the University's medical residents. The State argues that: (1) the Section 218 agreement does not cover medical residents because they are not employees of the University; (2) even if medical residents are deemed employees, they are nevertheless excluded from coverage under the agreement as "students"; and (3) even assuming both that they are deemed employees and are not excluded as students, the assessments are barred by the statute of limitations because the "Extension Agreements" were invalid and thus the September 13, 1990 assessment was untimely. Conversely, the Commissioner and the SSA contend that the assessment was properly made in all respects and should be upheld.

Discussion

I. *Summary Judgment Standard.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
**(Cite as: 1997 WL 33352908 (D.Minn.))**

Page 3

**\*3** Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in *Celotex Corp. v. Catrett,* 106 S.Ct. 2548, 2552-2553 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. *Bell Lumber and Pole Co. v. United States Fire Insurance Co.,* 847 F.Supp. 738, 743 (D.Minn.1994). However, the nonmoving party may not "rest on mere allegations or denials." *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995). Rather, "the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial." *Bell Lumber,* 847 F.Supp. at 743, *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).

If reasonable minds could differ as to the import of the evidence, summary judgment is not warranted. *Id.* However, a plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." *Rath v. Selection Research, Inc.,* 978 F.2d 1087, 1091 (8th Cir.1992), *quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510 (1986). In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." *Krenik,* 47 F.3d at 959.

The parties concede that this case is properly resolved on summary judgment.

## II. *Standard of Review.*

As a threshold matter, the applicable standard of review must be determined. The State contends that a *de novo* standard should be applied, whereas the Commissioner asserts that the underlying administrative decision is entitled to deference.

Courts have been cautioned to accord considerable weight to an agency's construction of a statutory scheme. *See Chevron, U.S.A., Inc. v. Natural Resources Defense,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782 (1984). Thus, courts should "defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering ." *Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 116 S.Ct. 1730, 1732 (1996). However, " 'that deference does not permit abdication of the judicial responsibility to determine whether the challenged [action] is contrary to statute, ... devoid of administrative authority[,]' or is otherwise unreasonable ." *Pelofsky v. Wallace,* 102 F.3d 350, 353 (8th Cir.1996)(citing *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1574 (Fed.Cir.1996). Moreover, 42 U.S.C. § 418(t) requires a "reconsideration" by the Court. This standard is less deferential than the standard of judicial review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) which permits an agency decision to be set aside only if it is "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law." *See Hennepin County Medical Center v. Shalala,* 81 F.3d 743, 748 (8th Cir.1996). Therefore, while the administrative decision here is entitled to some deference, the Court must determine that it is not unreasonable.

## III. *Employees.*

**\*4** The first issue is whether medical residents are employees for purposes of coverage under Modification No. 8.

The State argues that medical residents do not qualify as employees under Modification No. 8 because: (1) the "Identification No., Etc. Information" sheet of Modification No. 8 represented that 225 employees were covered by Modification No. 8 (AR 243), whereas 422 residents were enrolled at the University in the fall quarter of 1958 (AR 961, 964); (2) the minutes of the University's Board of Regents meeting in which Modification No. 8 was authorized referred to a coverage group consisting of "full-time lecturers and full-time appointees of instructors or research fellows and above ..." (AR 236), the named positions were faculty positions (except for lecturers which were a special category for classroom instruction)(*see* Bailly Aff., AR 1000-1001), the reference to "above" included only the positions of assistant professor (or research associate), associate professor and professor (*Id.*), and medical residents did not fall within any of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
**(Cite as: 1997 WL 33352908 (D.Minn.))**

classifications because they did not hold faculty appointments; and (3) IRS rulings in effect at the time Modification No. 8 was enacted determined that stipends paid to residents were excludible from income as "scholarships" or "fellowships" because the primary purpose of stipends was to further their education and training rather than to compensate for services (AR 249-252) and thus medical residents could not have been considered employees at the time Modification No. 8 was enacted.

On the other hand, the Commissioner argues that the residents are employees because they perform services for which they are compensated. The Commissioner relies on _St. Luke's Hospital Association of Cleveland v. United States,_ 333 F.2d 157 (6th Cir.1964), which determined that residents were not exempt under the intern exception to employment and thus were required to pay social security taxes; and _Rockswold v. United States,_ 471 F.Supp. 1385 (D.Minn.1979), _aff'd._ 620 F.2d 166 (8th Cir.1980), where the Court found that medical residents are considered employees of the University. The Commissioner also argues that the IRS rulings relied on by the State are irrelevant; that the SSA has always treated medical residents as employees (relying on Social Security Ruling ("SSR") 78-3); and the terms of the Section 218 Agreement and Modification No. 8 must be interpreted under the law as it existed in 1985 and 1986, not as it was in 1958.

In analyzing the issue, the Court is persuaded by the reasoning of the State that medical residents were not covered as employees under Modification No. 8 to the State's Section 218 agreement. First, it must be understood that Modification No. 8 is a contract and must be interpreted as such. _See_ Handbook for State Social Security Administrators, "Each modification, like the original agreement, is a Federal-State contract." In interpreting a contract, courts must give effect to the intent of the parties. _See Enos v. Key Pharmaceuticals, Inc.,_ 106 F.3d 838, 839 (8th Cir.1997).

\*5 In this case, the evidence is uncontradicted that the State did not intend to cover medical residents at the time it executed Modification No. 8. First, the "Identification No. Etc., Information" page of Modification No. 8 indicated that the modification would cover only 225 employees, whereas there were 422 medical residents enrolled in the University during the fall quarter of 1958. Obviously, if the residents were to be covered, the number would be something closer to 650. Second, the minutes of the Board of Regents meeting shows that Modification

No. 8 was intended to cover only certain faculty positions (except for the special classification of lecturers), which did not include medical residents. Third, prior to entering Modification No. 8, two IRS rulings had determined that stipends paid to medical residents were excludible from wages for IRS purposes because the stipends were primarily paid to further the residents' education and training. _See_ AR 249-252. While these rulings were issued by the IRS, not the SSA, the rulings would have necessarily led to the conclusion that the stipends would not be considered wages from employment under the Social Security Act. _See_ AR 271. Therefore, residents were not considered employees when Modification No. 8 was executed. Finally, after entering into Modification No. 8, the University did not begin to withhold or pay social security contributions on the residents' stipends as would be expected if the residents were intended to be covered by Modification No. 8. Instead, for more than 30 years, the University consistently treated the residents' stipends as excluded.

The Commissioner's arguments are without merit. While medical residents were found to be employees in cases subsequent to Modification No. 8, _see Rockswold,_ 471 F.Supp. 1385, and in a Social Security Ruling (_see_ SSR 78-3, AR 14-15), this does not change their status as of the time of the execution of Modification No. 8.

Further, the Commissioner's reliance on _Bowen v. Public Agencies Opposed to Social Security Entrapment,_ 477 U.S. 41 (1986)("POSSE") is misplaced. From the enactment of 42 U.S.C. § 418 in 1950 through 1983, states had the right to withdraw from coverage under § 418 upon giving two years notice. _Id._ However, in 1983, Congress amended § 418 to eliminate states' rights to withdraw from § 218 agreements. In _POSSE,_ the State of California brought suit challenging the validity of this amendment. _Id._ After the District Court found the amendment unconstitutional, the Supreme Court determined that Congress had expressly reserved the right to "alter, amend, or repeal any provision" of the Act and by amending the Act, to alter § 218 agreements entered under the Act. _Id._ at 54.

Based on _POSSE,_ the Commissioner argues that the § 218 Agreement here and particularly Modification No. 8 must be interpreted under the revisions to the law caused by SSR 78-3 and cases such as _St. Luke's,_ 333 F.2d 157. _POSSE,_ however, is inapplicable to the instant case because Congress has not acted. Under the theory of _POSSE,_ if Congress amended the Act in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
**(Cite as: 1997 WL 33352908 (D.Minn.))**

such a way as to change the meaning of Modification No. 8, the amendment would be permissible. However, POSSE does not stand for the proposition that the meaning of § 218 agreements can be changed through ruling by the SSA or through subsequent case law developments regarding the employment status of medical residents. Thus, the Court does not find that Modification No. 8, executed in 1958, must be interpreted under the law as it existed in 1985.

*6 To find that the University's medical residents are covered as employees, the clear intention of the State in entering into Modification No. 8 must be disregarded. In 1958, when the State agreed to Modification No. 8, it intended to cover certain faculty positions (and a special class of lecturers), not non-faculty medical residents. The law in effect at the time supported the University's belief that medical residents were not employees. Subsequent developments have not changed the fact that medical residents were not covered under Modification No. 8. The Commissioner's administrative decision to the contrary is unreasonable and the State's motion for summary judgment must be granted.

IV. *Student Exclusion.*

Assuming *arguendo,* that medical residents were considered employees for purposes of coverage, the State next argues residents would nevertheless be excluded from coverage under the student exclusion set forth in Modification No. 8, which specifically excludes "[a]ny service performed by a student." Under the Act, the student exclusion applies to service performed in the employ of a school, college or university "if such service is performed by a student who is enrolled and regularly attending classes at such school, college or university." 42 U.S.C. § § 410(a)(10), 418(c)(5). The applicable regulations provide: "Whether you are a student for purposes of this section depends on your relationship with your employer. If your main purpose is pursuing a course of study rather than earning a livelihood, we consider you to be a student and your work is not considered employment." 20 C.F.R. § 404.1028(c).

The State contends that medical residents qualify as students under the Act and the applicable regulations. First, the residents are enrolled at the University, pay student tuition and are registered for course work consisting of approximately 15 credit hours per quarter. The location and style of the courses include regular classroom type settings, laboratory research, and clinical experiences in which the resident is involved in the performance of a medical task under the supervision of a faculty member. *See* Cavert Aff., ¶ 6. Second, residents in their first year are not eligible for state licensure to practice medicine and residents beyond their first year are not required to become licensed because they are considered students engaged in the duties of a resident or equivalent "postgraduate" work. *See* Minn.Stat. § § 147.02, 147 .09(5). Third, although residents do have regular contact with patients, this contact is part of the educational process of the residents and is evaluated by the assigned faculty member. Fourth, failure to make satisfactory progress can result in dismissal of a resident from his or her program. *See* Ross v. University of Minnesota, 439 N.W.2d 28, 29-31 (Minn.Ct.App.1989). Fifth, residents are classified as holding "student/professional training," positions. *See* Drehmel Aff., ¶ 3. Finally, residents have been found to be students in other contexts. *See Ross v. University of Minnesota,* 00214C-T-87 (Sept. 29, 1987)(AR 255-259); and Ross, 439 N.W.2d 28.

*7 Conversely, the Commissioner contends that the residents cannot fall within the student exclusion because: (1) the student exclusion, along with other similar exclusions, was enacted only to cover situations involving nominal income; (2) the didactic portion of a resident's training is only a complement or a supplement to the actual practice of medicine; and (3) the enactment and subsequent repeal of the "intern" exclusion demonstrates that Congress did not intend for medical residents to be covered by the student exclusion.

The Court finds that even if the residents could be considered employees, they fit the applicable definition of a student and would be excluded from coverage under the student exclusion. Like regular students, the residents are enrolled at the University, pay student tuition and are registered for course work amounting to approximately 15 credit hours per quarter.

Medical residents have significant patient contact and assume substantial responsibilities for patient care _[FN4] as a necessary part of their medical education. A future physician cannot adequately develop skills if not permitted to perform actual procedures on real patients. However, residents are not entrusted with sole responsibility for patient care and instead are subjected to varying degrees of supervision depending on the resident's level of skill and seniority. In fact, the residents, like students in other disciplines, are evaluated on their performance.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
(Cite as: 1997 WL 33352908 (D.Minn.))

FN4. As set forth in *Rockswold v. United States,* 620 F.2d 166, 167 (8th Cir.1980), the duties of a resident include: making daily rounds with a staff physician; ordering prescriptions; writing treatment orders for patient care; taking patient's physical and medical histories; ordering special reports including consultations, x-rays, and chemical laboratory analysis; assessing and diagnosing patients; ... preparing progress notes, case summaries and discharge notes; commencing the administration of intravenous fluids; inserting nasal gastric tubes; scheduling operating room appointments; preparing patients for operations; preparing operating notes; changing dressings; removing sutures and working in the emergency room.

The State does not contend that a resident's duties, depending on the area of specialty, have significantly changed since the *Rockswold* decision was rendered in 1980.

Moreover, the clinical portion of the residency is only one component of the resident's educational experience. Residents also are taught on daily rounds, through lectures and formal didactic courses. Furthermore, residency programs are aimed at teaching and education. *See* AR 114 ("The [Family Practice residency] program is officially accredited by the Accreditation Council for Graduate Medical Education.... The ... program is designed to teach the knowledge, attitudes, and skills prospective family physicians need to provide continuous and comprehensive care to individuals...."); AR 412 ("The University of Minnesota Neurology Residency Program affords an outstanding educational experience for the future clinician and academician."); and AR 420 ("It is the objective of the graduate program in orthopaedic surgery to provide a comprehensive educational experience in the management of diseases and injuries of the musculoskeletal system for the physician seeking accreditation as an orthopaedic surgeon.). The emphasis on education, including through patient care and treatment, supports the finding that residents are students for purposes of the Act.

The student status of residents is also evident when they are compared to "regular" doctors. Unlike "regular" doctors who must be licensed to practice medicine, residents in their first year are not eligible for licensure and residents beyond their first year need not obtain a license because they are considered "students" under Minnesota law. *See* Minn.Stat. §

147.09(5). At the same time, like nonresident students, residents who are performing poorly and not making sufficient progress may be dismissed from their program. *See Ross v. University of Minnesota,* 439 N.W.2d 28, 33 (Minn.Ct.App.1989)("The decision to terminate a resident from a hospital-based residency program is the same as any other decision to fail a graduate student for inability to meet academic requirements.").

*8 Additionally, residents are classified by the University as holding "student/professional training" positions, which further supports their categorization as students. Moreover, in other contexts, residents are classified as students. Under the Minnesota Workers' Compensation statute, the definition of employee includes "students enrolled in and regularly attending the medical school of the University of Minnesota in the graduate school program or the postgraduate program." *See* Minn.Stat. § 176.011(18). For purposes of dismissal from a residency program, the Minnesota Court of Appeals determined a resident to be a student rather than an employee. *See Ross,* 439 N.W.2d at 33. Finally, a resident was found to be exempted from unemployment coverage because he was a "student" at the University of Minnesota. *See* AR 255- 59 (*Ross v. University of Minnesota,* No. 00214C-T-87).

After consideration of all these factors, the Court finds that the "main purpose" of a resident at the University of Minnesota is to pursue a course of study, rather than earn a livelihood. Through their residency programs, residents seek the necessary education and training to enable them to practice in their chosen field. While a resident is paid a stipend while enrolled in the residency program, the main purpose is obtaining an education, not earning a livelihood. Accordingly, under the applicable standard, residents qualify as students and are excluded from coverage under the Act.

The Commissioner's arguments to the contrary are not convincing. First, the Commissioner argues that the student exclusion was enacted only to cover situations of "nominal" earnings; that residents' stipends, which range between $20,000 and $28,000 annually, are not nominal; and thus residents cannot qualify for the student exclusion under the Act.

In 1939, the student exclusion was added to the Act. In fact, Congress enacted two separate student exclusions. For students at tax-exempt schools, like the University of Minnesota, the statute excluded:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
**(Cite as: 1997 WL 33352908 (D.Minn.))**

Service performed in any calendar quarter in the employ of any organization exempt from income tax ... if-

(i) the remuneration for such service does not exceed $45.00, or

...

(iii) such service is performed by a student who is enrolled and is regularly attending classes at a school, college, or university....

Social Security Act Amendments of 1939 ("SSA Amendments of 1939), Pub.L. No. 76-379, § § 201, 606, 53 Stat. 1360, 1374, 1384-85 (1939). Thus, the exclusion for students at exempt schools did not contain a remuneration limit. Conversely, the student exclusion applicable to students at non-exempt schools established a remuneration ceiling of $45 per quarter (exclusive of room, board and tuition). *See* SSA Amendments of 1939, § § 201, 606, 53 Stat. 1360, 1375, 1385 (1939). Since there was no dollar limit for students at tax-exempt institutions like the University, the Commissioner's argument is without merit.

**\*9** In addition, in 1950, Congress consolidated the two "student" exclusions and removed the remuneration limit applicable to students at non-exempt schools. *See* Social Security Act Amendments of 1950, Pub.L. No. 81-734, § § 104(a), 204(a), 64 Stat. 477, 497, 531 (1950). This amendment further supports the determination that the amount of remuneration received by an individual is immaterial to a determination of whether said individual qualifies for the student exemption under the Act.

Second, the Commissioner contends that the didactic portion of a residency is merely a "complement" or a "supplement" to the practice of medicine. As discussed *supra,* the education of a resident consists of several components including a didactic portion. Each portion of a resident's program, including the didactic and clinical components, are essential to properly educate and train a resident in a specialty. Consequently, the Commissioner's argument is unavailing.

Finally, the Commissioner relies on the enactment and subsequent repeal of the "intern" exclusion to argue that Congress did not intend to allow medical residents to be covered under the "student" exclusion. In 1939, Congress created an exclusion from Social Security coverage for interns. In enacting the exclusion, a House Ways and Means Committee report explained that the intern exemption, "excepts ... service performed as an intern (as distinguished

from a resident doctor) in the employ of a hospital by an individual who has completed a 4 years' course in a medical school chartered or approved pursuant to State law." [FN5] H.R.Rep. No. 728, 76th Cong., 1st Sess. 49 (1939), (quoted in *St. Luke's,* 333 F.2d at 163).

> FN5. An intern was an individual who had completed four years of medical school and was performing a one-year stint in a hospital for training purposes. As explained in *St. Luke's,* " 'intern' as used and understood by doctors and hospitals in 1939 generally referred to a medical student who was seeking a year of hospital training in order to complete his [or her] requirements for a medical degree and admission to practice." *Id.* at 161. By the time of the *St. Luke's* decision, the completion of a one-year internship was no longer a requirement for a medical degree. However, successful completion of an internship was a prerequisite to the admission to a residency program. Therefore, during the existence of internship programs, a medical student would complete four years of medical school, then serve a one-year internship and finally, if specialization was desired, complete a residency program. Internship programs were discontinued across the country, including at the University, in 1975.

The Commissioner contends that since Congress exempted both students and interns in 1939, Congress did not intend to exempt residents because it could have done so under the same provision and at the same time as it exempted interns. The Commissioner also argues that the enactment of the intern exclusion is inconsistent with the broad reading of the student exclusion proposed by the State. Under the Commissioner's theory, if the student exclusion covered both students in medical school and medical residents, it would also cover interns and thus the separate intern exclusion would be superfluous. Such an interpretation would violate accepted tenets of construction. *See In re Bellenca Aircraft Corp.,* 850 F.2d 1275, 1280 (8th Cir.1988)("A statute should not be interpreted so as to render the legislature's language mere surplusage.").

Finally, the Commissioner asserts that permitting residents to be excluded under the student exception would create an anomaly. In 1965, Congress repealed

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
**(Cite as: 1997 WL 33352908 (D.Minn.))**

the intern exclusion. Thus, after 1965, under the State's theory, both students in medical school and medical residents would be excluded from Social Security coverage, while interns, just graduated from medical school, would be covered. The Commissioner argues that such a result would be irrational and therefore medical residents must not be covered by the student exclusion.

**\*10** While this argument is superficially logical, further analysis reveals flawed premises. First, the fact that Congress did not specifically exclude medical residents at the same time as it excluded interns from coverage under the Act does not compel a finding that Congress intended to have residents covered under the Act. As set forth in *St. Luke's,* 333 F.2d at 161,

> The term 'resident' as used by doctors and hospitals in 1939 referred to a graduate physician, licensed to practice medicine, who served on the staff of the hospital. He might be seeking further training for use ultimately in private practice, or he might be a regular staff physician.

Since, in 1939, the term resident encompassed both residents-in-training (like the residents of today) and regular staff physicians, it is understandable that Congress would not want to exclude all "residents" as the term was then defined. Instead, in light of the educational purpose of resident training programs, it was proper for Congress to allow the coverage status of residents to depend on whether they qualified for the student exclusion.

In addition, there is nothing inconsistent or anomalous about excluding residents under the student exclusion. While both interns and residents underwent training, the focus of an internship was on service and exposing medical school graduates to patient care, whereas the focus of an internship was (and is) on education. *See* Cavert Aff., ¶ 18. The difference between interns and residents was evident in their treatment by the University. Interns at the University appeared as employees on the payroll of the University of Minnesota Hospital and Clinic; they were paid through the University's central payroll office; they were assigned payroll code number 9707, classified as "non-student academic;" and they were not enrolled as students. *See* Fearing Aff., ¶ 3 (AR 999); and Pladsen Aff., ¶ 2 (AR 1003). Furthermore, the University did not withhold income taxes from residents' stipends until January 1, 1982 (after the appropriate tax treatment had been established in several rulings), but the University always withheld income tax from medical interns salaries. *See* Pladsen Aff., ¶ 3 (AR 1004). The difference between

residents and interns was noted by the IRS when it ruled that stipends received by interns were taxable because they were required to perform hospital services, whereas stipends paid to residents were found not to be taxable. *See* AR 249-50.

In light of the substantive differences between interns and residents, it was not inconsistent to establish a specific exclusion for interns while allowing residents to be excluded under the more general student exclusion, nor was it an anomaly to allow residents to be excluded from coverage under the Act after interns were no longer excluded following the repeal of the intern exclusion.

In conclusion, under the Social Security regulations, an individual is deemed to be a student if her main purpose is pursing a course of study, rather than earning a livelihood: While residents are paid stipends, their main purpose is to obtain the necessary education and training to permit them to earn a livelihood in their chosen speciality. Accordingly, residents fall within the Act's definition of a student and are excluded from coverage. The Commissioner's decision to the contrary is unreasonable and must be rejected.

### Conclusion
**\*11** Based upon the foregoing, and all of the files, records and proceedings herein, IT IS HEREBY ORDERED that:

1. The State of Minnesota's Motion for Summary Judgment is GRANTED; [FN6]

> FN6. In light of the Court's decision, the State's statute of limitations argument need not and will not be discussed.

2. The Commissioner's Motion for Summary Judgment is DENIED; and

3. The Commissioner's determination that the State is liable for social security contributions with respect to stipends paid in 1985 and 1986 to medical residents enrolled at the University of Minnesota is incorrect and unreasonable and is, therefore, overturned. LET JUDGMENT BE ENTERED ACCORDINGLY.

### AMENDED ORDER
The May 21, 1997 Order issued by the undersigned in this case contained the following sentence,

> While both interns and residents underwent training, the focus of an internship was on service

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)
**(Cite as: 1997 WL 33352908 (D.Minn.))**

and exposing medical school graduates to patient care, whereas the focus of an internship was (and is) on education.

The use of the second "internship" was an error. The word "residency" should have been used.

Accordingly, based upon the foregoing, and all of the files, records and proceedings herein, IT IS HEREBY ORDERED that the second sentence of the first full paragraph on page 22 of the May 21, 1997 Memorandum Opinion and Order is amended to read:

While both interns and residents underwent training, the focus of an internship was on service and exposing medical school graduates to patient care, whereas the focus of a residency was (and is) on education.

Not Reported in F.Supp., 1997 WL 33352908 (D.Minn.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.